[No. 38415. Department Two. June 29, 1967.]

CARL FRISELL, as *Executor, Appellant,* v. ARTHUR NEWMAN
*et al., Respondents.**

*Reported in 429 P.2d 864.

Lester Stritmatter, for appellant.

Parr, Baker, Alexander & Cordes and Lynch & Lynch, by Frank E. Baker, for respondents.

HAMILTON, J.—On June 26, 1963, Amanda T. Hooker, a widow, commenced this action alleging the breach of a fiduciary relationship on the part of the respondent realtors revolving around the sale of her home property. She sought to set aside the sale, or, in the alternative, to recover the reasonable value of the property at the time of the sale. Before trial Mrs. Hooker died and the executor of her estate was substituted in her stead. From a judgment dismissing the action at the conclusion of plaintiff's evidence, the executor appeals.

The trial court, sitting without a jury, did not purport to weigh the credibility of the testimony adduced during the course of appellant's case. Neither did the trial court enter any findings of fact. Instead, in dismissing the action, the trial court held as a matter of law that appellant was foreclosed or estopped from pursuing the action by virtue of the prior conduct and deed of Mrs. Hooker. Under these circumstances, we review the propriety of the trial court's action from the standpoint of accepting appellant's evidence as true and according to it the most favorable inferences. N. Fiorito Co. v. State, 69 Wn.2d 616, 419 P.2d 586 (1966).

The pertinent facts may be stated as follows: In January, 1961, Mrs. Hooker, a retired state employee, 74 years of age, crippled with arthritis and virtually "housebound," was living alone in an old house on her 15-acre tract of land several miles out of Olympia, Washington. Her source of support was a small pension from the state ($42 to $43 a month). Seeking to render her eligible for welfare assistance, an old friend, Mr. Fred Williams of Williams Realty of Olympia, referred her property for listing for sale to respondents, Boone & Boone Realty, a member of the Multiple Listing Real Estate Bureau of Olympia. Mr. Williams and Mr. Horace E. Boone of the Boone firm then viewed the property, estimated its value, and on January 17, 1961, Mr. Boone procured Mrs. Hooker's signature on a multiple listing agreement offering the property for sale, less one acre on which the house was located, for the sum of $2,240 ($160 an acre), although evidence at the trial indicated the property was then worth approximately $500 an acre.

On January 23, 1961, the Boone firm reported the listing at a regular breakfast meeting of members of the Multiple Listing Bureau attended by respondent Charles Van Meter, an associate broker of respondents Arthur and Nora Newman doing business as Town and Country Real Estate. Mr. Van Meter, who owned property in the vicinity of the Hooker property, and was acquainted with values in the area involved, conceived the Hooker property to be undervalued and an excellent buy at the listed price. Accordingly, he consulted respondent James B. Whisler, his partner in a property development business known as Larch Mountain Homes, and under date of January 23, 1961, submitted, by way of an earnest-money agreement, an offer of $2,625 ($175 an acre) for the entire 15 acres, payable at the rate of $625 down and $50 a month including interest, and subject to the right of Mrs. Hooker "to have free rent on house and ingress and egress privileges as long as she shall live on property."

The earnest-money agreement, signed by Mr. Van Meter and Mr. Whisler as purchasers and by Mr. Van Meter as agent on behalf of Town and Country Real Estate, was

transmitted to Boone & Boone Realty. In turn, Mr. Boone, accompanied by Mr. Williams, obtained Mrs. Hooker's acceptance of and signature on the earnest-money agreement. Mrs. Hooker thereafter became dissatisfied with the price and refused to consummate the transaction. On May 8, 1961, Mr. Van Meter and Mr. Whisler initiated an action for specific performance. Mrs. Hooker failed to appear and default judgment was entered on June 15, 1961. At the behest of friends, an Olympia attorney, since deceased, informally interceded on her behalf and upon the basis of his assertions respondents Van Meter and Whisler moved to vacate the default judgment alleging as reasons therefor that Mrs. Hooker was physically unable to readily contact counsel, did not understand the importance of the matter, and did not wish to consummate the transaction. The motion was granted on July 17, 1961, and Mrs. Hooker was given 10 days to respond to the complaint.

In the meantime, the first attorney withdrew and a second attorney undertook to represent Mrs. Hooker. No responsive pleading to the specific performance complaint was served or filed, although negotiations apparently commenced about certain repairs and maintenance of the house on the premises to be furnished by respondents Van Meter and Whisler. Seemingly the negotiations did not proceed satisfactorily and on August 29, 1961, respondents Van Meter and Whisler again moved for judgment by default and noted the matter for hearing on September 5, 1961. No further action was taken on the motion; however, on October 31, 1961, Mr. Van Meter and Mr. Boone went to Mrs. Hooker's home and obtained her signature upon a real-estate contract, which provided, among other things, that the purchasers would pay the sum of $1,312.50 as a down payment and the balance of the $2,625 purchase price at the rate of $60 a month, including interest, and further that the purchasers would "maintain and keep in good repair all of the utilities upon said premises and also repair and maintain the residence property as needed" during the possession of Mrs. Hooker. The contract further provided that in case of any default on the part of the purchasers, Mrs.

Hooker was accorded the option of cancelling the agreement or declaring the balance forthwith due. A deed, reserving a life estate in the residence, was contemporaneously obtained from Mrs. Hooker and placed in escrow with her then attorney under instructions that it would be delivered only upon full compliance with all terms of the contract.

At this point in time, the sales commission due from Mrs. Hooker was withheld from the down payment and credited as follows: 3 per cent to the Multiple Listing Bureau, 70 per cent of the balance to Town and Country Real Estate (of this amount Mr. Van Meter received 60 per cent), and 30 per cent to Boone & Boone Realty.

Complaints soon developed over the sufficiency of the repair and maintenance work furnished or to be furnished by respondents Van Meter and Whisler. In short, Mrs. Hooker appeared to feel that the house, the electrical wiring, the septic tank, and the utilities were being allowed to deteriorate to the end of forcing her to vacate the premises. On September 12, 1962, she threatened legal action through the offices of a third attorney if appropriate repairs and maintenance were not forthcoming.

Delay, disagreement, and dissatisfaction continued. Mrs. Hooker, through her nephew by marriage, Carl Frisell, requested performance of the repair work or more money. Respondents Van Meter and Whisler demurred, and in the latter part of March, 1963, paid the contract in full and, without consulting Mrs. Hooker, obtained the deed from the escrow agent. About the same time Mrs. Hooker left the premises contending the house was uninhabitable. Thereafter, Mrs. Hooker employed present counsel and demanded full performance of the repair and maintenance work or cancellation of the transaction. Her demands being refused, this suit was instituted seeking rescission or damages in an amount equal to the value of her premises at the time of sale.

The underlying premise of appellant's action is that respondents, and particularly Town and Country Real Estate and Mr. Van Meter, were, from the inception of the prop-

erty transaction, Mrs. Hooker's agents and/or subagents. Upon this predicate it is contended that respondents breached the fiduciary relationship created by such agency status in failing to fully disclose to Mrs. Hooker the fair and true market value of her property as well as the conflicting interest generated by Mr. Van Meter's desire to purchase the property on behalf of his partnership enterprise. Respondents, in response, essentially contend that Mrs. Hooker either waived her claim for relief by failing to assert it in the specific performance action, ratified the transaction or compromised the dispute by executing the contract and deed, or that appellant is now estopped by her conduct, her deed and/or her death from obtaining any relief. Furthermore, respondents assert that, under local Multiple Listing Bureau regulations, participating members, other than the listing member, become agents of the purchaser rather than the seller, ergo, Town and Country Real Estate and Mr. Van Meter represented Mr. Van Meter's partnership rather than Mrs. Hooker during the course of the transaction in question.

As we have heretofore indicated, the trial court, in dismissing appellant's action, held as a matter of law that Mrs. Hooker's failure to assert her rights in the specific performance action, coupled with her subsequent conduct in executing the contract and deed, foreclosed the present claim for relief. Whether the trial court predicated this holding upon the doctrine of waiver, ratification, compromise and settlement, accord and satisfaction, or estoppel is not made clear either by the trial court's oral opinion or by counsel in their briefs.

In any event, we are constrained to disagree with the trial court, for we are satisfied that, under the circumstances appearing before the court at the conclusion of appellant's evidence, the question of the loss of appellant's cause of action by the prior actions of Mrs. Hooker became one of fact rather than one of law.

██ We start from the general and basic premise that, under ordinary circumstances, a real-estate brokerage firm with whom property is appropriately listed for sale be-

comes the agent of the seller for the purpose of finding a purchaser. *Ewing & Clark, Inc. v. Mumford,* 157 Wash. 617, 289 Pac. 1026 (1930); *Henderson v. Johnson,* 66 Wn.2d 511, 403 P.2d 669 (1965). From this agency relationship springs the duty and obligation upon the part of the listing broker to exercise the utmost good faith and fidelity toward his principal, the seller, in all matters falling within the scope of his employment. *Cantwell v. Nunn,* 45 Wash. 536, 88 Pac. 1023 (1907); *Westerbeck v. Cannon,* 5 Wn.2d 106, 104 P.2d 918 (1940); *Karle v. Seder,* 35 Wn.2d 542, 214 P.2d 684 (1950); *Farrell v. Score,* 67 Wn.2d 957, 411 P.2d 146 (1966). Corollary to and inherent in such realtor's responsibility to his principal, is the rule that the realtor cannot, legally or ethically, purchase or acquire, directly or indirectly, an interest in his principal's property without the explicit consent of his principal based upon a full disclosure by the realtor of all pertinent and material facts within the realtor's knowledge bearing upon the transaction. *Cantwell v. Nunn, supra; Breedlove v. Holton,* 143 Wash. 347, 255 Pac. 132 (1927); *Moon v. Phipps,* 67 Wn.2d 948, 411 P.2d 157 (1966); art. 14, Code of Ethics, National Association of Real Estate Boards. And, a failure on the part of such realtor to make the required disclosure and obtain the necessary consent amounts to a constructive fraud rendering the transaction voidable or the realtor otherwise liable at the instance of the principal, and/or, in proper cases, his heirs or personal representatives. *Watson v. Bayliss,* 62 Wash. 329, 113 Pac. 770 (1911); *Breedlove v. Holton, supra. Cf. Storey v. Gaisford,* 136 Wash. 378, 240 Pac. 9 (1925); *West Coast Life Ins. Co. v. Mori,* 14 Wn.2d 310, 128 P.2d 286 (1942); and see Annot., Does right of grantor to maintain a suit in equity to set aside his conveyance for cause survive to his heir? 2 A.L.R. 431 (1919), and 33 A.L.R. 51 (1924). Thus, where it appears that such a realtor has, directly or indirectly, purchased or acquired an interest in his principal's property, the burden of coming forward with proof of good faith, full communication of all known facts, and the informed consent of his principal rests upon the realtor. *Breedlove v. Holton, supra; Moon v. Phipps, supra.*

Against this background of general principles, we turn then to the particular situation presented in the instant case.

There can be no question but that Boone & Boone Realty, when it obtained an exclusive listing for the sale of Mrs. Hooker's property, became her selling agents and owed to her the obligations above discussed. But, what relationship arose between Mrs. Hooker, Boone & Boone Realty, Town and Country Real Estate, and Mr. Van Meter under the multiple listing arrangement?

Generally speaking, a multiple listing service may be defined as an arrangement between a number of real-estate brokers in a given area whereby any member broker is authorized to sell property exclusively listed with any other member broker. By agreement between the member brokers, all pertinent listings with the various members are registered with a central exchange office or bureau and thereafter disseminated to the other member brokers for their information and action. When a sale of a listed property is introduced by any member broker, other than the listing broker, the sales commission is divided between the selling broker, the listing broker, and the central registration office. H. Lusk, Law of the Real Estate Business, ch. 2, 10, 11 (rev. ed. 1965); E. Hebard & G. Meisel, Principles of Real Estate Law, ch. 17, 394-95. See, also, *Evanston-North Shore Bd. of Realtors v. United States,* 320 F.2d 375 (1963). As observed in the cited case, multiple listing services, operating usually on a nonprofit corporate basis, are primarily a cooperative sales device through which real estate may be merchandised efficiently and expeditiously to the greater advantage of sellers, buyers, and the participating realtors.

The Multiple Listing Real Estate Bureau of Olympia, with which we are here concerned, is, according to the testimony adduced during the course of appellant's evidence, organized as a nonprofit corporation and operates in the fashion above described. The listing agreement, which Mrs. Hooker signed, was addressed to Boone & Boone Realty as a member of the local multiple listing bureau, and in pertinent part provided:

528

In consideration of your agreement *to list the property described above with the Multiple Listing Real Estate Bureau of Olympia, Inc.*, during the life hereof and to use your efforts to find a purchaser therefor, I hereby grant you for the period of Six Months from the date hereof, the exclusive right to sell or exchange said property, or any part thereof, at the price and terms stated hereon or at such other price or terms of exchange to which I may agree, . . . . During the life of this contract if you find a buyer who is ready, able and willing to buy said property at said price and terms, or any other price or terms to which I may agree in writing, or if I agree to an exchange of said property, *or if said property is sold or exchanged during said term by me or any other person, firm or corporation, or if it is sold or exchanged within three months after such expiration to any person to whom you or any member of the Multiple Real Estate Bureau of Olympia or any person authorized by a member of the Multiple Listing Real Estate Bureau of Olympia have previously offered it,* I agree to pay you a commission of 10% ............ of the sale price . . . . (Italics ours.)

▇▇▇ It thus appears that (a) the exclusive listing for the sale of Mrs. Hooker's property was given to Boone & Boone Realty, as a member of the Multiple Listing Real Estate Bureau of Olympia; (b) by the terms of the listing agreement it was incumbent upon the Boone firm to relist the property with the listing bureau; (c) the listing was then disseminated exclusively to members of the bureau and the property was subject to sale by any member of the bureau; (d) if a qualified and accepted buyer was found by any member of the bureau, or if the property was sold pursuant to an offering made by any member of the bureau during the prescribed duration of the listing, a real-estate commission was payable by Mrs. Hooker; (e) if the negotiations giving rise to liability for a commission were produced by any member of the listing bureau, other than Boone & Boone Realty, the commission was divisible between the producing agency, the listing agency, and the Multiple Listing Bureau; and (f) Town and Country Real Estate, acting through its associate broker Mr. Van Meter, negotiated the questioned transaction with respondents

Van Meter and Whisler as partners in Larch Mountain Homes and claimed a share of the sales commission, of which share Mr. Van Meter received 60 per cent.

Under these circumstances, it appears clear that the selling agency, Town and Country Real Estate together with its associate broker, respondent Van Meter, became authorized subagents of Boone & Boone Realty in seeking a sale of Mrs. Hooker's property. As such, they along with Boone & Boone Realty owed to Mrs. Hooker the obligations of good faith, fidelity, complete disclosure, and the burden of establishing an informed consent to Mr. Van Meter's direct or indirect purchase of her property. *Reich v. Christopulos,* 123 Utah 137, 256 P.2d 238 (1953). *Cf. Nelson v. Title Trust Co.,* 52 Wash. 258, 100 Pac. 730 (1909). And, these obligations could not be circumvented by an internal corporate bureau regulation, prematurely and arbitrarily designating the listing broker as the seller's agent and the other bureau members as buyers' agents.

We accordingly conclude that appellant's evidence, disclosing the circumstances surrounding Mr. Van Meter's acquisition of an interest in Mrs. Hooker's property, established the essential basis for cancellation of the transaction or other appropriate relief. The burden of establishing respondents' good faith, full disclosure, and Mrs. Hooker's informed and unreserved consent to the transaction thereafter resided with respondents.

Finally, we are of the view that a determination of whether Mrs. Hooker's conduct and actions, following initiation of the specific performance suit, foreclosed pursuit of this action, under any theory advocated before us, presents a question of fact, or one of mixed law and fact, rather than one of law alone. Mrs. Hooker's failure to earlier assert the present claim basically revolves about the purpose and character of the assurances by respondents Van Meter and Whisler that they would keep and maintain the utilities and premises in tenantable condition, and the nature and extent of Mrs. Hooker's reliance thereupon. In this respect, appellant's evidence, when accepted as true and viewed in a light most favorable to appellant, would support a finding

530

that Mrs. Hooker's nonaction was induced by hollow declarations.

We hold the trial court erred in dismissing the action at the conclusion of appellant's evidence. The cause is therefore remanded for new trial. Costs on appeal will abide the result.

FINLEY, C. J., ROSELLINI, J., and BARNETT, J. Pro Tem., concur.